I'll call the first case of oral argument today, United States of America v. Ezell Brown. Mr. Brodin. Good morning. May it please the Court. My name is Clinton Brodin. I represent the appellant Ezell Brown. The one thing I can tell, and probably the only thing I can tell this Court with certainty, is this is a false statement case. Beyond that, I'm not the smartest person in the room, but I don't think I'm stupid, and I couldn't tell you, standing here today, what the government is really alleging the false statement to be. And I submit one of the reasons for that is because the forum shopping went on in this case and the government trying to squeeze an Eastern District case into the Northern District, as they want to do in the Plano-Sherman division. The agents prefer to take the cases to the Plano division because I think they're more willing to take questionable cases. But be that as it may, the indictment in this case says that the false statement is, quote, the W-2 pay stubs and verification of rent from the buyer, and that they're fraudulent and were affirmed as true at the closing in the Eastern District of Texas. And it appeared to me reasonably, I submit, that what they were alleging was that the W-2s, pay stubs, and their verifications of rent were themselves false, and they were somehow presented at the closing as true documents when, in fact, they were false documents, and those were the statements, the statements within those documents that were presented at the closing as the false statements. Nevertheless, when we presented our motion to elect at the close of the government's case, the government's position was clear that it was the uniform residential loan application, the URLA, itself that had the false statements because the government's position, and again it was clear, was that the URLA itself allegedly affirmed the truth of these other underlying documents. The indictment referred to the W-2, to the pay stub, and to what was called a verification for a buyer, alleging they were false, correct? And the government says, and affirmed as true. And affirmed as true at the closing in the Eastern District of Texas. Right. Right. Those references to affirmation closing arguably could only have pointed to the URLA. That's certainly the government's position. As I said, I'm not. It is the government's position. My question is what's wrong with that? Why isn't that an adequate notice? Well, if you read it, it says nothing about the URLA. I think a reasonable interpretation is that it is the documents themselves that were presented at the closing and affirmed as true. In other words, at the closing somebody said here's the W-2 and this is true. And that was certainly my interpretation. But let's credit the government's interpretation for a minute because the point I'm going to get to is no matter how you skin the cat, there are problems. And honestly, even to this day, I think the government, it's brief. At one point argues it's the URLA that contains the false statement. At other points, it seems to argue that it's these underlying documents that go with that. You make them out to be such a big difference between the W-2s, the underlying documents, and then the loan application itself. But since the W-2 information and the rent information is included, the income information and the rent information was put onto the loan application. I know there's a 1 missing in one of the boxes, but it's basically the same the way I look at it. I'm looking at it here. Why does it really matter? I mean, in other words, if the W-2s and the rent are false, then that same information put in the loan application is false, right, or no? Well, it matters for a couple of reasons. If it is the documents themselves, then it's a clear venue problem because none of these documents were presented at the closing. So if you take what I thought was a reasonable interpretation to begin with and it's I'm just going to use the W-2 for shorthand, it's the W-2, then it's a clear venue problem because no one is arguing that the W-2 itself was presented at the closing. Right, but the falsity in the W-2 is that the same false information is in the loan application, which was signed in the Eastern District. Well, that goes to the notice depending on how you're preparing. But, yes, if you take the fact that it is the URLA that's the false statement, then you go, and I think the best constructive argument, the sufficiency illustration is the 2009 Adams case. What you're taking, then, is the statement in the URLA, and the statement in the URLA says the information provided in this application is true and correct as of the date set forth opposite my signature. It's not purporting to affirm the W-2, the verification of rent, or the... But if that same information is listed on the application, I mean, the Charles Pest Control, monthly income, $16,6950, renting this box of monthly income, rent, $800, that's coming from the rent verification form. I understand the Court's point, and that's what happened in Adams. In Adams, it was a 1040X that purported, the juror purported to affirm the earlier submitted, I think it was a Schedule C, and rather than the government alleging that the 1040X was the false statement, they alleged that the Schedule C that was affirmed by the juror at the 1040X was the false statement. This Court said, no, you can't do that, and used the Latin term. I'm not going to... But if the underlying documents are false, the URLA was necessarily false. You would agree with that as a conceptual matter, I'll take it. If the UR... I'm sorry. If the underlying documents we're talking about, the sub, et cetera, were false, then by necessity, the URLA was false. No, not by necessity. I mean, granted, that's going to, as a practical matter, that's probably true, but... As a practical matter, it had to be false because they were incorporated in the URLA. Well, that assumes they were incorporated into the UL, those particular documents. Well, that's what the jury was charged to without objection, as I understand it. And exactly what the jury was charged? The jury was charged that they had to find what was allegedly indictment, that these documents were false, and then the government put the gloss on it, that they were affirmed as true in the URLA. Okay. And what's the injury to you here? Inadequate notice? Well, there's several injuries. I mean, depending on the ‑‑ we've got the constructive amendment issue, because depending upon what documents you're talking about, there's a disadvantage. An impermissible constructive amendment presupposes that there's inadequate notice. That is, you're entitled to be indicted. That's your basic constitutional right. And part of that is to know what you're indicted for. And so do you focus then on whether the documents themselves are false, or do you focus on the documents themselves being false and the jurat being false? I don't see how you could focus on that. It doesn't strike me, looking at this, that the whole trial was about the falsity of these documents, right? The falsity of the underlying documents,  If you turn it over and you said URLA, how would you prove that URLA was false? The government would prove it the same way. I understand. The proof would then have been that these underlying documents were false. Correct. But then we would have had an expert testify as to what the jurat really meant. The same exact thing in the Adams case. What does this jurat really mean? And does the jurat say that these underlying documents that were never presented at the closing were false, or do they say the information in the URLA is false? And that's what it comes down to, just as in Adams. The government could have alleged these figures in the URLA are false. They didn't do that. Why they didn't do that is sort of the question that the Adams court raised. Why didn't they allege the 1040X figures were false rather than the Schedule C? And it's the same exact argument in this case. They get to write the indictment. They get to live with the indictment, and this indictment was a mess from day one because of this attempt to squeeze this northern district case into the eastern district. That's why we had two trials in this case. But so even if you take, I mean, if you go under the assumption that it was the underlying documents, which, as I said, even to this day the government's brief seems to take both positions, but if you go under the assumption that it's the underlying documents, there's a constructive amendment problem because the government admits or admitted at trial or during the discussion, the motion to elect, that that was not what was presented to the grand jury, and there's a sufficiency problem because we know that the W-2 and the verifications were not presented at the closing in the eastern district, which the eastern district line and the northern district line was probably between me and the court in this case where the title company took place. I believe it's complicated with the city of Dallas and the Collin County, and there's a little smidgen, but in any event. But if you take the other position, if you operate under the assumption that the government was alleging that it was the affirmation that was false, not the URLA was false, but the affirmation in the URLA was false, you have a constructive amendment problem, you have a sufficiency problem, and you have a venue problem. The constructive amendment problem and the sufficiency problem is exactly the same as Adams. There is no difference. I wish Adams was a published case. It's not, but the reasoning is exactly the same. You have the jurat in the 1040X. Here you have the jurat in the URLA. What attack was made on the indictment prior to trial? The attack, so to speak, was, as I said, I was operating the assumption. Response to the indictment. I was operating the assumption that they were alleging it was the W-2, the verification of rent, verification of employment were the false statements, and they were presented at the closing. So my position was, and I had a case law to support this, I forget, I think it was the Nix case, but in any event, that at the close of the evidence the government would have to elect which of those documents it was really alleging was the false statement and which was the presented one. What did you do prior to trial? Did you file a motion to dismiss the indictment or not? Did you in any way raise this issue prior to trial? I did in the sense I filed a trial brief saying you can't do this, you're going to have to elect at the close of the evidence, which is, and again, I think the case is Nix, but it says that's the proper procedure. You make the government do it. I'm just trying to understand the procedural pathway followed here. I must suggest you faulted in any way of what happened. The case goes to trial, and at trial you presented the trial court with a brief that made this argument. Prior to trial, but yes. Prior to trial. Okay. The government was, I noticed, three or four years as to what I recently thought the indictment was saying. Now, granted, I guess it wasn't anything they had to respond to, but they were on notice that I thought it was these underlying documents I was going to expect them to elect at the end of the government's case pursuant to what I understood the case law to be. I was more concerned about what the district court knew than what I was. Well, the district court would have known the same thing because it had the trial brief. And then, again, under the assumption that it's the affirmation or the juror in the URLA that's really the false statement that was presented to the grand jury and that was alleged in this case, you have a venue problem, and that goes to the Patsoff case and the Reese case. This statute is 10,009, I believe, presenting a false statement to a bunch of various lending type of agencies in the government. Katzoff and Reese involved 1014, which is a very similar statute. In Katzoff, the false statement was a financial statement. It was made and submitted to the RTC in Atlanta. It wasn't clear how it got to Atlanta, but it was prepared in the Eastern District of Pennsylvania, and the court said that is not sufficient because, you look, the offense is the submission to the RTC, just as here, the offense is a submission to HUD, and that's exactly what the government charges in indictment, the submission to HUD. And the submission in that case took place in Atlanta. There was no evidence as to how it got to Atlanta. Here the submission took place from the Northern District of Texas where the title company was based, or the lender was based, rather. I thought the URLA was signed in the Eastern District of Texas. It was signed in the Eastern, just as the financial statements in Katzoff were signed in the Eastern District of Pennsylvania, but the court said the offense is the submission to the government agency, the RTC in that case, the HUD in this case, and it was submitted in this case from the Northern District to the District of Colorado where HUD was located. The Northern District, where, from Dallas? The Northern District in Dallas where the American Home Key, which was the lender, was located. So in other words, somehow, probably by courier, it gets from the Eastern District. They walk it over to me. Well, it's only 10 miles. And then they make sure all the documents and send it to HUD in the Northern District. And Reese basically says the same thing. What do you do with our cases, though? We have 1,001 false statement cases, saying it's where the false statement is made establishes venue, which also just seems, I mean, that's the criminal act, is making the false statement, so it seems to be supported by common sense. Therein lies the rub. You know, even the Third Circuit and the Fourth Circuit, where Katzhoff and Reese are at, have the same 1,001 interpretations. But their interpretation, and really it's the only cases that discuss this in terms of a non-1,001 sort of lending institution, it's the submission to the government agency. And that's what the government alleged here, that it was submitted that this was a crime because these false documents, false statements, whatever you consider false statements to be, were submitted to HUD. Well, they weren't submitted to HUD until they were mailed from the Northern District to the District of Colorado. And, in fact, the judge in this case, and that's where the 1,001 cases kind of come from, go on, go to this, you know, begun in one district, ended in another district. I'm drawing a blank as to the continuity. And the Katzhoff case and the Reese case analyzed that and said, no, this is a little bit different here because the offense is submission. The offense doesn't take place until the documents are submitted to, in this case, HUD, in those cases, the RTC or the Federal Home Loan. I think we said the same, though, with cases involving filing of false tax returns. I mean, it's basically your position that in these kinds of cases, the only place where there would be a venue would be they're sent to Colorado. Is that right? I would agree. So someone in Miami signs all these false papers that are closing, they have to be prosecuted in Denver? No, not necessarily. If they're mailed from, I mean, Florida has, so I guess that's the Southern District. If they're mailed from the Southern District of Florida to the District of Colorado, you can prosecute in the Southern District. You're saying where they're sent from or where they end up. I might have had an argument because the cases aren't clear, but I would concede, for our purposes, that they could have been prosecuted in the Northern District. This case should have been prosecuted in the Northern District of Texas if the government, if the prosecutors there believed it was worthy of being prosecuted. But in any event, I think it could have been prosecuted in the Northern District of Texas, and I believe one of the— Isn't the real issue with going to these different districts, I've actually written a concurring opinion criticizing the Eastern District for this venue problem you mentioned. But in my experience, it's not so much that, oh, this is a good case, Rebecca. It's all different U.S. attorneys' offices have different thresholds. So for drug cases, some U.S. attorneys' offices say, well, we're only going to do 5 kilograms or more cases. Smaller, more rural districts say, well, it's less. And so for fraud, it's dollar amounts. So Dallas might have, we're only taking million-dollar cases. Eastern District says we'll take $100,000 cases. And in fairness, I don't know the inside baseball to it. I mean, I wasn't a former U.S. attorney, but it seems— and Judge Dennis was just on a panel, the Dr. Nematali case, same exact thing. They tried to shoehorn an Eastern— No, I think it's troubling. Like I said, I've written an opinion. I agree with your general point. And, I mean, you know, this case— There's supposed to be members of that community deciding, you know, whether there's a crime. This case busted once because of that, and I think that's why we see all the problems, because they have to go through the machinations. Well, what documents were actually presented in the Eastern District? How can we shoehorn this into the Eastern District? And it causes all these sufficiency and destructive amendments. One quick question. How did you preserve your issue of venue? We—well, and the government raises that issue. It is our position that the government was unnoticed back in— I forget when we first tried this case. When did you move to dismiss, change—like want a venue or— No, because we wouldn't have been entitled to a hearing on that. The court is— Did you raise it to the district court or tell anybody that you were in the wrong venue? When did you raise the question of venue? I was shouting venue from the very first day of the first trial. Now, as far as a dismissal, I did not file a motion to dismiss because the indictment adequately alleged venue. And for all I knew, the government was going to come in and say, ah-ha, this W-2, see, it was presented opposing. My point is your argument is an insufficient proof at trial that venue was laid. Correct. All right. Thank you. Thank you, sir. Mr. Visosky. Good morning, Your Honors. Counsel, may it please the Court. I'd just like to start with an explanation of the indictment in this case. For counts 1 through 3, of which the 1,006 charge was a part, the government alleged that Mr. Brown knowingly made false entries in the reports or statements submitted to HUD, namely by making inflated statements about the buyer's assets and rent history, knowing that the statements were false in connection with an application for a home mortgage. And specifically with respect to count 3, it alleged, as Mr. Broden said, that W-2 pay stubs and verification of rent for the buyer, Sandra Johnson, are fraudulent and were affirmed as true at the closing in the Eastern District of Texas. As Judge Schell realized in the district court, the only possible document that that last statement affirmed as true at closing in the Eastern District of Texas could be referring to was the loan application. And Mr. Broden's argument before Judge Schell was, well, the government didn't establish that those three underlying documents were presented at closing and were shown as false at the actual closing. And Judge Schell realized that what makes those documents important is not the documents themselves but the information conveyed by the documents and that the information from the underlying documents fed into the loan application and that those documents were proven at trial as false. In terms of the specific legal arguments raised by Mr. Brown, in terms of the variance, there was a long colloquy back and forth about this whole duplicity issue. And defense counsel said, well, the government must select one document to be submitted to the jury. And after many, many transfer pages, the prosecutor said, okay, we choose the loan application, meaning the document that, as the district court said, synthesized all of the information from the underlying documents. Who made the decision to loan the money? I would imagine it would be the lender who would have— That was made where? The lender was located in the northern district of Texas. And the closing took place in the eastern district, and the HUD office was in the district of Colorado. There couldn't be a crime until that decision was made. Well, until the decision to loan the money was made. Is that right? No, no, no. Under the statute? No, what the statute defines as the crime is the making of a false statement. And Mr. Brown assumes, and I think he's correct, that the false statement was made at the closing by signing the affirmation in the eastern district of Texas. And as the district court recognized, it is a continuing crime. It was made there. But it has to be a false statement that has a tendency, at the least, to affect the ultimate decision. Correct. And that goes to the materiality argument, Your Honor. And just one point I would like to make to just clarify the record on that. In Mr. Brown's brief at page 40 to 41, he says that the case agent told the court that HUD is already on the hook because it's an FHA loan by the time it gets to closing. And he cites the record at 2680. That statement was not made by the case agent. It was made by the prosecutor. And she later clarified, just a few pages later at 2684, that HUD is not at risk of financial loss until the loan closes. And that just makes sense. The closing of the loan is what sets everything in motion. Everything in motion. If the loan does not close, the lender does not loan the money, and HUD is not liable for insurance on the FHA loan. Where was this case tried? In Plano, Your Honor. In Plano? Yes. Going back to the variance argument, in looking at whether there is a variance or a constructive amendment, this Court's opinions say you look at the indictment and the Court's jury instructions. And Mr. Brown's contention all along throughout all of the briefing in the district court and on appeal was that he understood, for whatever reason, but he understood that the indictment only alleged that the underlying documents were false. And yet he conceded in the district court. And the jury instruction just asks about the underlying documents. Correct. So isn't that a venue problem? Because I think everyone recognizes the underlying documents were not created, filled out, signed in the Eastern District. And so the jury never made a finding of a criminal act that occurred in Plano, did it? Well, two responses to that, Your Honor. One, that's not Mr. Brown's argument. I know that. He did not raise that as a ground in the district court. I mean, to me, you see these jury instructions. If your contention is that the government must elect, they elect a loan application, and then the jury instructions only ask about the underlying documents that you're contending have nothing to do with the Eastern District of Texas and you don't yell up and down, why are you asking only about the underlying documents? But there was no objection. So that's what the jury was asked about. And even on appeal, the argument is still not that the jury was asked about the underlying documents and there's no venue for that. But it is true that what they were asked to find did not occur in the Eastern District. There's no evidence that the underlying documents were prepared in the Eastern District of Texas. I'll concede that, Your Honor. Another theory was Brown did it at night, that one night in the office, which was in the Dallas or Northern Division district. Right. But what I would say, Your Honor, is that the closing is still what sets everything in motion, and that's what this Court's Herbermann decision talks about. For a continuing offense statute, it's what sets the district in which things are set in motion is a district of proper venue. So the closing is what sets everything in motion. The closing is what causes the loan application to be sent to the lender in the Northern District of Texas, and then for that lender to send the entire loan package, including the loan application and all of the underlying documents, all of which contain false statements, to HUD. So even if we were stuck with just the underlying documents, we still have an argument that venue was proper in the Eastern District of Texas, apart from the first argument that that's not a point raised, it was not a ground for objection at the district court, and it's not a ground in his appellate brief either. He only talks about the U.R.L.A. Whether you get this conviction affirmed or not, it does seem, I mean, I hope there's a lesson here. So there's a trial in this case. The first trial doesn't go forward or stops because of a venue problem. That results in a double jeopardy appeal to our court. Then it gets tried again. Now you're back here on a venue problem, and it just seems there's a lot cleaner ways to prosecute the cases in the district where the core of the conduct occurred. I mean, I do think it's because I've seen other cases, mostly drug cases, where, you know, someone drove from Indianapolis to Dallas. That was this drug route for this major organization, and because they drove through East Texas and didn't really do anything there, that's venue. I mean, the law allowed that, but it just seems to me there's what the law allows and then there's what prosecutors should be doing. No, we appreciate that, Your Honor, and I think you mentioned the Romans case. Right. And, you know, you touched on it earlier. I mean, the reality of that case was in the NAU's attorney's office it was below their thresholds, and we have a prosecutor that is just very aggressive, works all the time, took that case. But the arguments and the policy considerations, I think, that were raised in your concurrence in that decision fit here because you were talking about the, you know, defendants' fairness issues of being tried in the vicinage, and here Plano is. I can see the Dallas skyline from my office in Plano, Texas, and just the community's interest in law enforcement. Well, the point is this was a simple case, but you complicated it. The prosecutors complicated this case. Well, I would acknowledge, Your Honor, that the indictment could have been. But it's a simple case. It is, and you complicated it by the drafting of your indictment, for getting there and continuing right through. And I think that's the point my colleague is making. That causes a lot of expenditures and difficulties of time as well as the agony of the defendant himself. There's no need for this kind of, you know, if you go to trial, you can't prove venue. I mean, come on. No one up here is a stranger to trials. I'm not fussing at you. We're just trying to give you a message back for the future because we don't want to see you again to this kind of problem. I don't think we will, but . . . No, I understand, Your Honor. All right. Thank you. This is a fourth or fifth case I've sat on very recently with an eastern district venue problem. And we didn't reverse on all of them, and I would think we reversed on one. But we had to work like heck to find the stuff in the record that we could bless it. Part of the problem is that, and it's not the U.S. Attorney's creature, but in the wisdom of drawing the district lines in Texas, the eastern district of Texas used to span up through the countryside of north Texas, and then Dallas grew northward. That's why I'm smiling when you say you tried it in Plano. That's part of the metroplex of Dallas itself, and it's a stone's throw from there over to the northern district of Texas. The eastern district of Texas. So it all blends together, and it's out of that reality that we're getting a lot of these problems. That is, it's no longer the rural part of the eastern district. It's part of the Dallas metroplex. And so it's just across the street, and you're in a different district. And so, to me, that heightens the necessity of being very careful about the venue because the venue is not a technical requirement. It is a constitutional right. No, I understand, Your Honor. But I think that that argument kind of supports bringing some of these cases in the eastern district, given that it is part of. I say that's what causes the difficulty. I understand that. It's the metroplex. So I'm sympathetic to your problem. My concern is the way you're addressing the problem. If the problem is there, you know it, and deal with this at the outset and not three years later still arguing about this kind of problem. Well, there's no question that we don't indict cases that don't have a connection to the eastern district of Texas. And in this case, I mean, I think it's a very important connection here. And arguably, yes, the documents, well, the loan application was made and signed in the eastern district. The underlying documents, there's no evidence that they were. But the closing took place, and the closing is really arguably the most important activity in the whole system because HUD is not liable for mortgage insurance unless the loan closes. And I can assure the court that, you know, we analyze cases in our district just to make sure that there is a sufficient connection to the eastern district. It might not be the best place or where most of the conduct occurred, but of course it just has to be a place where some of the conduct occurred, you know, such to provide protections to the defendant where his family is located, you know, things of that nature. In terms of the materiality argument, again, this goes back to comparing the indictment with the jury instructions. Mr. Brown argues that the evidence was insufficient, that the loan application was material to the lending decision. There are two problems with that. One is, again, the jury was not asked about the loan application as Mr. Brown concedes. He concedes that it was only asked about the underlying documents, and Mr. Brown concedes in his brief that there was evidence that the underlying documents were material to the lending decision. Two, the focus on the lending decision I think is inappropriate  What 1006, what the statute talks about is making a statement to HUD, so the important purpose for HUD is the insurance of the FHA loan. And I pointed out earlier that Mr. Brown refers to the case agent making some statement that HUD's already on the hook by the time of the closing, that that was not made by the case agent, so it was not evidence in the record. It was made by the prosecutor. The prosecutor later clarified that HUD suffers no risk of financial loss until the closing takes place, and there was evidence from Bill Stokes, who was the quality assurance representative from HUD, who testified as an expert in the case, that HUD's quality assurance department in these types of loans takes place post-closing, that what they do is once they get the loan package in Colorado, they do checks to make sure that there were adequate protections and that the information was correct and that the lender who they have relationships with should have made these loans. And so the loan application would have been sent to HUD in Colorado, so if it contained false information, it surely would have been material to HUD if that information was false. And the test for materiality is simply whether it has the possibility or could impair or pervert the functioning of a government agency, and there was evidence in the record of that here. Going back to Venue, he says 1001, it's clear in our district, it's where the statement is made counts for a 1001 false statement. He tries to distinguish that by saying, well, that's not a statute where it has to be received by a government agency like HUD. What's your response to that? I don't see any difference between it, Your Honor. The cases that talk about Venue being appropriate in venues where statements were made, prepared, or signed, talk about just the false statement statutes generally, and I don't see how 1006 differs from 1001 in that regard. In one case, I'd just like to point out— So you're just saying our law is just different than the Fourth Circuit's? Correct. That's an 80-year-old Fourth Circuit case, but you think we're at odds with them? And frankly, I just don't understand how it makes sense that somehow the Northern District, where the loan application was not signed or made, would somehow be a proper place of Venue just because it was mailed from there in the closing that set everything in motion, and where Mr. Brown assumes that the statement was made, and where he admits that the loan application was signed, would not be. In one case to that point, Your Honor, I did not cite it in the brief, but it is along the lines of Fifth Circuit decisions that we do cite, Seventh Circuit Judge Wood's opinion in United States v. Clark, 728 F3D 622. And there the court says, even if the completion—this was also a Section 1001 case. She says, even if the completion of a Section 1001 offense requires the submission of false documents to federal authorities, it does not follow that the making of false documents cannot constitute the beginning of the offense. And there she makes the same point that we do in our brief, that 1001, just like 1006, makes the false statement itself. It's the very wrong that the statute describes. And, I mean, it just seems common sense that the place where the statement is made, which is the statutory language used, would be a place of proper venue. Your Honors, unless the court has any further questions, I'd just like to rest on the brief. Thank you. Thank you, sir. Just briefly, I'll have this briefly. Judge Schell didn't think I was a crazy man. He basically said, okay, I see how you're reading this indictment, Mr. Brodin. I see how the government's reading it. I think the government, I can understand the government's reading. So he wasn't clear that I was some crazy man just reading the indictment crazily. On the venue, you said when you were up here last time that your position is there's venue from either where it was sent from, put in the mail, or where it's received. For our purposes today, yes. Didn't you know, based on the indictment, whether it was the W-2s or the application, maybe you didn't find out later which it was, but whether it was either of those, didn't you know before trial that the documents were not mailed from the Eastern District or received in the Eastern District? No, I didn't. I didn't know how until there was testimony at trial as to the progression of eastern, northern Colorado. I didn't know what the government was going to do. Well, you knew they weren't received there. I knew they weren't. No, I honestly didn't know at the time. There was no discovery or anything in this case? And I was about to say, in fairness, there was a Colorado office, but whether it went to an Eastern District office and then to Colorado where there's a main repository, no, I did not. I have to be quite candid with the Court. In relation to Judge Higginbotham's optimism, I will point out that this case involved one of the same prosecutors at trial, the same prosecutor on appeal as the Nematale case which Judge Dennis set on the panel. They're going to keep doing this, Judge. Don't kid yourself for one minute. They're going to keep doing this. They did keep doing it. After the first Brown case, they tried Nematale and made these same arguments, and there we were. But part of it, I mean, I've been critical of the process, like I said, in that opinion, but it's, you know, for decades the Eastern District of New York and the Southern District of New York have been trying to get venue over cases, and it's a similar situation where you've got two U.S. attorneys' offices in the same metropolitan area. So some of it is inevitable. You say same metropolitan, and it is true, but I will tell you as a trial lawyer, and just talking about State court, I would much rather try a case with a Dallas County jury than a Collin County jury. There aren't many people buying low-income houses in Dallas County. You're not going to get just Dallas County. Well, I understand you're going to get Kauffman or wherever, but I think there is a difference, and I think any trial lawyer would tell you they'd rather try in the Northern District. But all this comes down to, I think, is the jurat in the closing statements, which it says the information provided in this application, not the W-2 or the verifications, is true and correct as of this date. So it couldn't even be referring to the W-2s because it's as of this date. Those documents were submitted 10 days earlier, and that's when we go to the Latin phrase in Adams. My mother wanted me to take Latin, but inclusio unius est exclusio alterius, and basically says when it talks about this application, it's talking about the application, not the W-2, not the verifications were alleged by the government in count three in the indictment. Thank you. Thank you, sir.